WILLIAM B. GREENOUGH, Attorney General, vs. ALLEN
THEATRE AND REALTY CO., et al.

JULY 5, 1911.

PRESENT: Dubois, C. J., Blodgett, Johnson, Parkhurst, and Sweetland, JJ.

(1) *Building Laws. Erection. Alteration. Statutes.*

Application was made to the inspector of buildings of the city of Providence
for a permit to make a certain alteration to an existing stable, so that it
might be used as a theatre. The plans and specifications were approved and
a permit issued. At the time of granting such permit the building laws of
said city were comprised in a special statute pertaining only to said city,
Pub. Laws, 1909, cap. 472, and containing in sec. 27 provisions relative to the
construction of "every new building hereafter erected or altered, to be used
as a theatre." With this statute the plans and specifications conformed,
including the requirements relative to inner courts or passageways.

At the January Session, 1911, Pub. Laws, cap. 702, was passed, providing
that every theatre thereafter erected should be built to comply with the
requirements of said chapter, with changed requirements as to open courts.
The act took effect upon its passage, at which time the roof had been removed
with the greater part of the interior fittings, but certain posts, the boiler
room and office were undisturbed. Eight feet of the front wall had also been
removed, and a concrete foundation for new walls had been built and some
excavation made. Cement and brick had been contracted for.

*Held,* that the principal object was the construction of the theatre and not
the conservation of the stable, and if portions of the latter remained in the
new structure it would still constitute the *erection* of a theatre, rather than
the *alteration* of the stable.

*Held,* further, that the theatre within the meaning of chapter 702 was not
*erected* at the time said act went into effect.

(2) *Construction of Statutes.*

In the absence of express intent to the contrary statutes should be construed
as prospective and not retrospective.

(3) *Construction of Statutes. Title of Act.*

Where there is doubt or obscurity in the body of an act, the title may be
consulted as a guide to the probable meaning of the legislature and should
be accorded some weight in the interpretation.

(3) *Construction of Statutes. Police Power. Vested Rights.*

Pub. Laws, cap. 702, January Session, 1911, entitled "an act in amendment of
chapter 131 of the General Laws, entitled 'of diminishing danger to life in
case of fire,'" is in the exercise of the police power, and is an amendment
of a prior act, and also of a special act relating to the city of Providence,

the effect of chapter 702 being to make the requirements more rigorous. It affects all theatres not theretofore erected and includes all theatres in process of erection irrespective of the beginning of the work, and no "vested rights" of a party who has commenced work prior to the passage of the act can prevent its enforcement.

(4)   *Definition of Term by Statute.   "Open Court."*

Pub. Laws, 1911, cap. 702, provides that every theatre thereafter erected —shall have an open court or space in the rear and on the side not bordering on the street where said building is located on a corner lot and on the rear and both sides of the building where there is but one frontage on the street.   Said open courts shall be at least six feet wide throughout their length and shall extend the full length and width of the building and across on each side and rear thereof where its side or sides do not abut on a street or alley and shall be the same width at all points, etc.

*Held,* that Pub. Laws, cap. 472, sec. 27, having defined an "open court" as one completely open overhead, it was not necessary to repeat the definition and the term as used in cap. 702 had a similar meaning.

INFORMATION IN EQUITY.   Heard on appeal of respondents and overruled.

DUBOIS, C. J.   This is an information in equity brought by William B. Greenough, Attorney General, at and by the relation of Spencer B. Hopkins, Inspector of Buildings of the City of Providence, against Allen Theatre and Realty Company, a corporation, and one Alexander Martin.   Said information seeks an injunction, both temporary and permanent, against the alteration into a theatre of a building of said Allen Theatre and Realty Company without the construction of courts and passageways adjoining the same in accordance with the provisions of Pub. Laws, 1911, cap. 702.

In the Superior Court upon the hearing on the petition for a preliminary injunction, a decree was entered granting the same in accordance with the prayer of said information.

The cause is now before this court, upon the defendants' appeal from said decree.

There is no dispute in regard to the facts of the case. The material facts, admitted by the answers or agreed upon in a certain stipulation entered into between said parties and filed in the Superior Court, may be briefly summarized

as follows: The Allen Theatre and Realty Company, a Rhode Island corporation, on April 18, 1911, made application in writing to the Inspector of Buildings of the City of Providence for a permit to make a certain alteration to an existing building situated in said city and formerly used as a stable and carriage repository, in accordance with plans and specifications submitted therewith. From said plans and specifications it appeared that said building was intended to be used as a theatre to accommodate more than three hundred persons; that the premises on which it was located bounded in front westerly on Union Street, northerly on Worcester street, and easterly and southerly on private estates, and not on a street or alley; that said proposed alteration would change said building wholly on the inside, modify its external walls, and involve the building of a new roof. Said plans and specifications were approved by said Spencer B. Hopkins, Inspector of Buildings, as in accordance with the building law of the City of Providence, and on said date of application, April 18, 1911, a permit in writing, No. 646, was granted to said corporation to make the aforesaid alteration. On April 20, 1911, said corporation entered into a contract with Alexander Martin, George F. McDuff and Frank H. Whitney, co-partners doing business in said city under the firm name and style of Martin, McDuff, and Whitney, whereby the latter were to make said alteration, and on or about April 21, 1911, work was commenced thereon. On May 4, 1911, said Martin, in substitution for this contract, contracted with said corporation to make said alteration, said Martin contract being the same as the prior one except in the matter of parties, said other contractors being released at their request by said corporation from the performance thereof. The work on said alteration actively continued up to the date of the filing of this information. At the time of the granting said permit, the building law of said city was comprised in a special statute pertaining only to said city, being Pub. Laws, 1909, cap. 472, and containing in sec. 27 thereof certain provisions relative to the con-

struction of "every new building hereafter erected or altered, to be used as a theatre." With this statute, the aforesaid plans and specifications of said alteration conformed, including the requirement that "every theatre built upon the corner of two streets shall have one inner court or passageway on the side thereof which is parallel with or opposite the side street line of the building," and the further requirements that such passageway shall extend "from the proscenium line to the line of the street on the front, . . . shall immediately adjoin the auditorium, or a side passage or lobby directly connected therewith," and "shall be at least six feet wide" and "open to the sky opposite the whole length of the auditorium." Subsequently, at the January Session, 1911, an act in amendment of Sec. 2 of cap. 131 of the Gen. Laws, (Pub. Laws, 1911, cap. 702), was passed, providing that " '. . . Every theatre or opera house, or other building intended to be used for theatrical or other operatic performances hereafter erected for the accommodation of more than three hundred persons, shall be built to comply with the requirements of this section. Every such building shall have an open court or space in the rear and on the side not bordering on the street where said building is located on a corner lot, and on the rear and both sides of the building where there is but one frontage on the street as hereinafter provided.

" 'Said open court or courts shall be at least six feet wide throughout their length and shall extend the full length and width of the building and across on each side and rear thereof where its side or sides do not abut on a street or alley, and shall be the same width at all points, and suitable exits shall lead into such open courts. The said open courts shall not be used for storage purposes or for any purposes whatsoever except for the exit and entrance from and to the auditorium and stage and must be kept clear during performances.'

"Sec. 2.  This act shall take effect on its passage."

This act took effect upon its passage, May 12, 1911, as

provided therein, and the provisions thereof requiring courts or passageways to be made on all sides of buildings thereafter erected to be used as theatres, which do not abut on a street or alley, and to the extent of the full length and width of said building, superseded said provisions of said building law of said City of Providence, so far as inconsistent therewith, and particularly those provisions thereof relating to said open courts or passageways in connection with buildings to be used as theatres. At the time said amending act took effect, May 12, 1911, the following work had already been done in connection with the alteration to said building: The roof had been removed, together with the greater part of the interior fittings, but there remained undisturbed certain posts, the boiler room and the office. Eight feet of the front wall adjoining the Hanley building for the whole height of the building had also been removed. The concrete foundation had already been built for the new south wall (next to Hanley building) as well as the concrete foundations for the new proscenium walls. There had been some excavation. All cement and brick to be used in the execution of said Martin contract had already been contracted for by said Martin before May 12, 1911, the time said amending act took effect. Subsequently to the passage of said amendment said inspector notified the defendants to make said alteration in conformity with the requirements thereof, but said defendants refused to comply, alleging that said Public Laws, 1911, cap. 702, did not apply to said alteration. At said hearing, in pursuance of the aforesaid stipulation entered into between the parties, verified copies of said Martin contract, said permit to build, and said plans and specifications respectively were introduced as exhibits.

The only matters denied by the defendants in their answers are certain conclusions set forth in the fifth paragraph of said information, to wit, that said proposed alteration will materially change the external walls of said building and that the proposed alteration practically amounts to the erection of a new building, and the conclusions alleged

in the eighth paragraph thereof to the effect that defendants' acts are a violation of said amending statute.

The defendants appealed from said decree granting said preliminary injunction upon the following grounds:

(1)    That the said decree is against the law.

(2)    That the decree is erroneous in that the act in amendment of Sec. 2, of cap. 131, of the General Laws, entitled "of diminishing danger to life in case of fire" mentioned in said information, does not entitle the complainant to the relief granted by said decree.

(3)    That the decree is erroneous in that the provisions of said act do not apply to the acts of the defendants in altering the building described in said information.

(4)    That the defendants are under no obligation by reason of said amending act or otherwise to construct and leave open the courts and passageways specified in said act.

(5)    That the said decree is erroneous in other respects which the defendants pray they may be allowed to assign at the hearing.

Thereupon the defendants contend: "Public Laws, 1911, cap. 702, amending General Laws, 1909, cap. 131, § 2, does not apply to the completion of said alteration to said building.

"A.    The completion of said alterations does not constitute a building 'hereafter erected' within the meaning of said amending act.

"1.    The express language and intent of Public Laws, 1909, cap. 472, sec. 27, and the modification thereof in Public Laws, 1911, cap. 702, amending General Laws, 1909, cap. 131, sec. 2, restrict the operation of said amending act to the entire construction of new buildings, excluding therefrom changes to existing buildings.

"2.    The authorities hold that an alteration to an existing building as great or greater in extent than that being made to said building is not a 'building erected' within statutes restricting the construction thereof.

"3.    The authorities hold that where a permit to do con-

struction work on a building has been granted under an existing law, contracts made therefor, and work commenced thereon, the completion of such work is not within the meaning of building regulations subsequently enacted relating to buildings 'hereafter erected.'

## II.

"If it be assumed for the sake of argument that Public Laws, 1911, cap. 702, amending General Laws, 1909, cap. 131, § 2, does apply to the completion of said alteration to said building, nevertheless it does not require the construction of 'an open court or space' which is open to the sky.

## III.

"The defendants' appeal should be allowed."

And in support of their contention they argue as follows: "Public Laws, 1911, cap. 702, amending General Laws, 1909, cap. 131, sec. 2, does not apply to the completion of said alteration to said building.

"Admitting that said amending act modifies Public Laws, 1909, cap. 472, sec. 27, and thereby imposes new requirements as to buildings 'hereafter erected' in the city of Providence for theatrical purposes, the determination of this cause primarily involves the issue:—What is a building 'hereafter erected' within the meaning of said amending act? It is submitted that:

"A. The completion of said alteration does not constitute a building 'hereafter erected' within the meaning of said amending act.

"That such is not the case appears from the express language of the statutes under consideration and from an examination of the authorities.

"1. The express language and intent of Public Laws, 1909, cap. 472, sec. 27, and the modification thereof in Public Laws, 1911, cap. 702, amending General Laws, 1909, cap. 131, sec. 2, restrict the operation of said amending act to the entire construction of new buildings, excluding therefrom changes to existing buildings.

"(a)  That said restriction exists appears from the express wording of said acts.

"It was under Public Laws, 1909, cap. 472, that a permit to make an alteration to an existing building was granted to the defendant corporation.  It is important to note that sec. 27 of this act, providing for the construction of an open passageway on one side of a building to be used as a theatre, expressly applies to 'Every building hereafter erected or altered, to be used as a theatre.'  Thus the distinction between the 'erection' and the 'alteration' of a building was clearly recognized and the legislature wishing to include both situations in the operation of this law expressly named both.  A careful examination of this entire statute shows that this distinction is taken throughout, some of the sections applying to buildings erected and altered, and others merely to buildings erected.

"In section 7 of said act the legislature further recognized the limitations of the word 'erection,' by expressly extending the scope of said act to alterations of and additions to buildings, in the following language:—

" 'SEC. 7.  Any alteration in or addition to any building already erected, or hereafter to be built, except necessary repairs, not affecting the construction or the external party or other walls, or any bearing partition or any chimney or stairway, shall to the extent of such work be subject to the regulation of this act.

" 'No building already erected or hereafter built shall be raised or built upon in such manner that, were such building wholly built or constructed after the passage of this act, it would be in violation of any provision thereof.'

"It is at once evident that it did not consider the term 'erection,' in itself, broad enough to include alterations and additions.

"Finally it should be noted that to avoid any possible dispute as to what might constitute an 'alteration,' the legislature took the further precaution to define the term in sec. 5 of said act as follows:—

" 'Alterations: Any change, addition, or modification in construction, or the building in, or installing, any new fire-place or elevator.'

"Thus the term 'alteration' as used by the legislature in this act is most comprehensive, and is made synonymous with changes, additions, and modifications, to a building already in existence, whether great or small.

"Keeping in mind then this broad definition of the term 'alteration,' the careful distinction between 'alteration' and 'erection' recognized throughout said act, and more particularly the joint use of the two terms in sec. 27 thereof relating to the passageway to be constructed in connection with buildings to be used as theatres, let us compare with it the language of Public Laws, 1911, cap. 702, amending General Laws, 1909, cap. 131, sec. 2, which, by imposing new requirements for the construction of passageways in connection with buildings to be used as theatres in all the cities of the state, admittedly modified said sec. 27, applicable only to said City of Providence.

"Said amending act reads in part:

" 'Every theatre or opera house or other building intended to be used for theatrical or other operatic performances hereafter erected for the accommodation of more than three hundred persons, shall be built to comply with the requirements of this section.'

"Is not the absence of the word 'altered' and the mere use of the term 'erected' most significant? The legislature was well aware that by its action it was modifying the effect of a section expressly dealing with buildings 'hereafter erected or altered,' and that said section was part of an act which throughout made the distinction between 'altered' and 'erected.' Obviously if it had intended to make the amending act applicable to buildings thereafter 'altered' as well as 'erected' it could and would have done so as it had done in this earlier act. Can it for a moment be contended that the alteration to defendant's building is of a character so extensive as to amount to the erection of a new building

within the scope of said amending act?   How is such a position possible when we recall that in the very law it was seeking to modify the legislature had previously and explicitly defined 'alterations' as 'any change in construction,' great or small?   Knowing the broad scope it had already given to the term 'alteration', it chose to omit the word 'altered' altogether from the amending act.   The conclusion must be that it did not intend that the amending law should apply to alterations of any kind, whatever their character and extent.   The object of such a course is obvious and is based on sound reason.

"(b)   That the legislature restricted said amending act to the entire construction of new buildings, excluding therefrom any changes and additions to existing buildings, is further evidenced by the fact that such action is based on sound reason.

"If it be asked why the legislature made this distinction, applying Public Laws, 1909, cap. 472, sec. 27, to buildings 'hereafter erected or altered', but limiting Public Laws, 1911, cap. 702, to buildings 'hereafter erected,' the reason is at once apparent.   Both of these acts involve the exercise of the police power and an interference with vested property rights for the protection of the public.   But the earlier act provides for the construction of a passageway on only a portion of one side of a building to be used as a theatre, whereas the later one requires such passageways on two sides throughout their entire length.   Clearly the latter was a much greater interference with vested property rights than the former and hence there was every reason why the legislature should have deemed it wise to make its application less extensive than that of its predecessor, especially as it was not so essential for the public welfare.   Public safety demanded that there be at least a passageway on a portion of one side of all buildings to be used as theatres and as a result the earlier law was made applicable to all such buildings, whether erected anew or altered for such purposes.   But while it was also desirable from the standpoint of public

safety that there should be passageways on two sides of such buildings, the need therefor was not so urgent as in the previous case, especially with the earlier law still in effect. This law could still be applied to the alteration of existing buildings if the provisions of said amending act were not made inconsistent therewith. Consequently, desiring not to impose too great a hardship on property owners in a situation already reasonably cared for in the interest of the public, and realizing that such courts could be constructed throughout the entire length of two sides of a new building much more readily and at less expense than could be done in the alteration of an existing building, the legislature wisely decided to limit the application of said amending act to the erection of entirely new buildings and therefore with good reason omitted the term 'altered.'

"2.   The authorities hold that an alteration to an existing building as great or greater in extent than that being made to said building, is not a 'building erected' within statutes restricting the construction thereof.

"(a)   From the admitted facts it appears that the following change and alteration is being made to said building:

"Said building formerly used as a stable and carriage repository is being adapted for use as a theatre. This involves changing the building wholly on the inside; modifying its external walls in the following particulars:—Erecting a new wall forty feet high from the street line of Union Street to the depth of the proposed auditorium and six feet from the party wall on the southerly side of said premises; the raising of the building from the new proscenium line of the auditorium to said easterly side with an increased height of about twelve and one-half feet, utilizing the existing party walls on the southerly and easterly sides, and raising the present northerly wall about twelve feet for a distance of about forty feet from said easterly side; the raising of the northerly wall beyond about two feet for a distance of about forty-eight feet and of the remainder of said northerly wall to Union Street about six and one-half feet for a distance

of about fifty-two feet; the raising of the Union Street wall about nine feet for a distance of about one hundred and two feet; and the building of an entirely new roof:"

(1)   In order to appreciate the changes necessary to be made in the stable building in order to adapt it for the uses of the proposed theatre it may be well to consult the specifications relative thereto which are entitled: "Specifications for the materials and labor required in the alteration of 'Billings Stable' so-called, . . . into a theatre, for Mr. Charles Allen." Under the title: "Present Building," the following items appear: "Take up the present concrete floor of first story and all wood floors throughout the entire building. Remove the present roof and take down all partitions now in the building. Remove all brick-work, chimneys, stairs, carpentry, iron work and masonry of all kinds and any and all other portions of present building, that in any way interfere with or are not required in the carrying out of the new work as called for by plans or by these specifications. Take down any and all portions of exterior of present building necessary to make it conform to the new drawings of same." From the foregoing it is not a violent assumption to infer that an executive officer of the defendant corporation found at the corner of Union and Worcester streets, in the city of Providence, an eligible site for a theatre. That the land was not a vacant lot, but had been built upon and the building thereon had been used and occupied as a livery stable. Judging from the foregoing references to "present building" in the specifications, it would seem as though it would have been to the advantage of the defendant had the land been vacant instead of being improved as it was; however, this was hardly to be expected in the heart of a large and growing city, and the defendant became the purchaser and thus found itself with a livery stable upon the site of the proposed theatre. In these circumstances the defendant had to face the problem of demolition as well as that of construction, and as it appears that there were party-walls, on boundary lines, as well as some exterior walls

of the stable, which might, perhaps, in part, be saved for the theatre, engineering and architectural problems were presented which were properly taken for solution to persons skilled in those professions. Can it properly be said that Billings Stable was to be altered into Allen's Theatre? We think not. The preservation of any portion of the stable was at most a secondary consideration and dependent entirely upon its non-interference with the new work called for by the theatre plans and specifications. The principal object of consideration was the construction of Allen's Theatre, and not the conservation of Billings Stable. To the accomplishment of this object the saving of any fragment of Billings Stable was subordinate.

The material portion of Pub. Laws, 1911, cap. 702, § 2, to be considered in this connection, reads as follows: "Every theatre . . . hereafter erected . . . shall be built to comply with the requirements of this section." It is evident that the foregoing words "erected" and "built" are used synonymously and interchangeably, and probably were so used to avoid repetition. It is also manifest that Allen's Theatre on the corner of Union and Worcester streets, in the city of Providence, Rhode Island, was not erected May 12, 1911, is not yet erected, and if ever it shall be erected, it will be hereafter erected. Even if portions of the stable remain in the new structure it will constitute the erection of a theatre. "Where a dwelling house is enlarged, remodeled, and fitted up as a livery stable, designed and adapted for such use, it is erected for such use, within St. 1810, c. 124, providing that no building shall be erected within the town of Boston as a livery stable within a certain distance of any church." Syllabus to *Hastings* v. *Aiken*, 1 Gray, 163, 165.

"A 'building erected' is quite distinct from a 'building being erected.' A building is a fabric or edifice constructed for use. To erect, when used in connection with a house, or church, or factory, is to build; and neither can be said to be erected until they are built, completed." *McGary* v. *The People*, 45 N. Y. 153, 161.

"There is no difference in the meaning of the word 'erect' when applied to a whole building, and when applied to a part of a building.   In both cases it means 'to build.' "   Lacy, J., in *Carroll* v. *City of Lynchburg*, 84 Va. 803, 804.

"The law gives a lien to mechanics on 'every building erected' by them; but not for adding to or altering an old building.   The parties in their contract call this work, additions and alterations; but is it properly so?   Every part of the house was reconstructed, except a part of three walls, and even in them the openings are new.

"There must necessarily be cases wherein it is difficult to decide whether work done is to be regarded as the erection or as the alteration of a building, unless we regard as an alteration, any building in which old materials enter as an element, which would be unreasonable.   A saddle may be new, though old stirrups, and even some leather of an old one be used in making it.   A sawmill may be new though it has an old water-wheel or forebay.   Where the structure of a building is so completely changed that, in common parlance, it may be properly called a new building or a rebuilding, it comes within the lien law.   This is sometimes difficult to decide, and then it must be left to the jury.   Under the evidence here, the court might have decided that it is a case of a 'building erected,' within the meaning of the lien law, and ought not to have ordered a nonsuit."   Lowrie, J., in *Armstrong* v. *Ware*, 20 Pa. St. 519, 520.

So in the case at bar, the fact that the parties to the contract and specifications, have seen fit therein to name the work to be done thereunder: "the alteration of 'Billings Stable,' so called, into a theatre," is not a final and conclusive disposition of the matter, for the appropriateness of the name selected must always depend upon the facts of the case, and under the evidence submitted it clearly appears that the parties to the contract and specifications therein and thereby contemplated the erection of a theatre. We are therefore of the opinion that for the purposes of this branch of the question under consideration the case stands

the same as if the lot upon which the theatre is to be constructed had been vacant on April 18, 1911, the date of the granting of the permit to build.   The defendants, however, insist that by the granting of the permit to build and the contracts entered into in conformity therewith and the work done thereunder they have acquired vested rights in the premises which should not be disturbed, and that therefore the law subsequently enacted relating to buildings "hereafter erected" does not apply.   In support of this contention they cite several cases, but principally rely upon the case of *City of Buffalo* v. *Chadeayne*, 134 N. Y. 163, as follows: "This action was brought to recover a penalty for an alleged violation of an ordinance pertaining to the erection of wooden buildings within the prescribed fire limits of the city of Buffalo.   On the 11th day of July, 1887, the common council of the city passed a resolution granting permission to the defendant to erect seven frame wooden houses upon premises owned by him, and specifically described.   This resolution was duly approved by the mayor, and thereupon the defendant entered into a contract for the materials with which to make such structures.   He made excavations for the cellars, and laid a portion of the walls, prior to the first day of August.   On that day the common council, without notice to him, passed a resolution which it is claimed rescinds the former resolution."   . . .   "The charter of the plaintiff (Chapter 519, Laws 1870) provides that 'the city shall have power by its common council from time to time to enact ordinances, . . . to prescribe the limits within which wooden buildings shall be erected and the manner in and material of which all buildings shall be constructed within such limits.   Every building erected or placed contrary to any ordinance passed under the last above provision shall be deemed a common nuisance and may be abated as such.'   Title 3, § 8, subdiv. 4.   Pursuant to this provision, the common council enacted ordinances, among which we find the following: 'No person shall, without permission of the common council, erect, place, or move any

building constructed in whole or in part of wood, within the limits of the city of Buffalo, as defined by section 2 of title 1 of the charter of said city.' Ordinances, chap. 5, § 20. The defendant's buildings are within the fire limits, as prescribed by the ordinance. He therefore had no right to construct them without the permission of the common council. Such permission, as we have seen, was granted on the 11th day of July, 1887, and thereby he acquired the right to proceed with the construction of his buildings, and to possess and enjoy the comforts they might afford. As soon as he had entered upon the construction of the buildings, and incurred liabilities for the work and material, he had a property interest in them. To this right he was entitled to protection. *People* v. *O'Brien,* 111 N. Y. 1–62, (18 N. E. Rep. 692); *In re Union El. R. R. Co.,* 112 N. Y. 61–75, (19 N. E. Rep. 664); *People ex rel* v. *Otis,* 90 N. Y. 48–52; *Stuart* v. *Palmer,* 74 N. Y. 183; *Detroit* v. *Plank-Road Co.,* 43 Mich. 140, (5 N. W. Rep. 275).

"It is claimed by the appellant that a municipal board may reconsider its action at any time before private vested rights have resulted from such action, and that the defendant could not acquire vested rights as against the police power of the state or municipality. For the purposes of this case we may concede these propositions. As to the first, it appears, as we have seen, that the defendant had entered upon the construction of his buildings, had made contracts, and incurred liabilities thereon, before the common council attempted to reconsider its action giving him a permit to construct of wood. A private property right had, therefore, vested in him prior to the rescission of the resolution. As to the second, his right may be subject to the police power of the state, but the difficulty is that the state has not seen fit to deprive him of such right by the exercise of such power, nor has it delegated the same to the municipality. The state has given to the municipality power to prescribe the limits in which wooden buildings shall not be erected. This pertains to the future, and not

to existing wooden buildings. The ordinance to which we have referred provides that no person shall without permission of the common council, erect any building in whole or in part of wood, within certain limits. This has reference to buildings that shall be erected in the future, and not to existing buildings, or to those erected with the permission of the common council. So that neither the charter nor the ordinance authorizes it to interfere with existing buildings, or those constructed with its permission. There is consequently no power given to the common council to deprive the defendant of any vested property rights in the buildings. If the common council could interfere and rescind its permit after a building is partially constructed, it could also rescind after it was fully completed. It would consequently follow that every person who in the past has constructed wooden buildings with the permission of the common council is now liable to have his permit revoked, and his buildings declared a nuisance, and abated as such. The restrictions authorized by the provisions of the charter under consideration are for the purpose of the prevention and extinguishment of fires. It has no reference to buildings that may become a nuisance by reason of their becoming dangerous to the public. Having in view the purpose for which the provision was enacted, it seems to us clear that it was not intended to give to the common council the power to deprive persons of their buildings which had previously been erected, or of those which should be thereafter erected, in whole or in part, with the permission of the common council; and that its power is limited to the prevention of the erection of wooden buildings in the future without its permit."

Without doubt the above construction of the city charter and the powers of the city thereunder was entirely correct. It involved the consideration of what power had been delegated to the city by the legislature and whether the city was in the proper exercise of the same. This case is cited as follows in 1 Smith, The Modern Law of Mun. Corp. § 610:

"The charter of a city authorizing the making of ordinances 'to prescribe the limits within which wooden buildings shall not be erected' pertains to the future, and an ordinance made thereunder, prohibiting without the council's permission the erection of any building constructed in whole or in part of wood within certain limits refers to buildings to be erected in the future, and not to buildings in existence and erected by such permission."

The defendant also cited the following authorities: *Regina* v. *Howard*, 4 Ont. Rep. 377. *State* v. *Tenant*, 110 N. C. 609.

It should be noted that the reason for the rule laid down in these cases is not that retrospective legislation is beyond the police power of the state, but rather, admitting the right of the state to so legislate, it is insisted that such legislation, interfering as it does with vested property rights, should in general be construed strictly, and more particularly, as prospective and not retrospective, in the absence of express language to the contrary.

(2)   That in the absence of express intent to the contrary statutes should be construed as prospective and not retrospective, is well established by the authorities.

Cooley's Const. Lim. 7th Ed. 529: "Nevertheless, legislation of this character is exceedingly liable to abuse; and it is a sound rule of construction that a statute should have a prospective operation only, unless its terms show clearly a legislative intention that it should operate retrospectively."

36 Cyc. 1204: "A statute is prospective only which expressly declares that it is not retroactive, which by its terms is to apply to actions or to things done 'hereafter' or 'thereafter,' or is to take effect at a future date, or which contains, in the enacting clause, the phrase, 'from and after the passing of this act.' . . . It is a rule of statutory construction that all statutes are to be construed as having only a prospective operation unless the purpose and intention of the legislature to give them a retrospective effect is expressly declared or is necessarily implied from the language used.

In every case of doubt, the doubt must be solved against the retrospective effect."

The defendants therefrom conclude that: "In view of this strict rule favoring a prospective construction, it is difficult to comprehend how said amending act, making use of such language as 'building,' 'hereafter erected,' and 'this act shall take effect on its passage,' can be construed as other than prospective. And it has already been decided by a case on all fours with the principal case that a prospective construction of said amending act must necessarily exclude from the operation of said act the completion of this 'alteration' to defendants' building as previously contracted for and commenced under a permit duly obtained according to law. *City of Buffalo* v. *Chadeayne*, 134 N. Y. 163."

"The object of all construction and interpretation of statutes is to ascertain the meaning and intention of the legislature, to the end that the same may be enforced." . . . "Every statute is to be construed with reference to its intended scope and the purpose of the legislature in enacting it; and where the language used is ambiguous, or admits of more than one meaning, it is to be taken in such sense as will conform to the scope of the act and carry out the purpose of the statute." . . . "The title of a statute can not control or vary the meaning of the enacting part, if the latter is plain and unambiguous. But if there is doubt or obscurity in the body of the act, the title may be consulted, as a guide to the probable meaning of the legislature, and should be accorded some weight in the interpretation. *Blais* v. *Franklin*, 31 R. I. pp. 95, 105 *et seq.* Thus considered, we find the title of Pub. Laws, 1911, cap. 702, to be: "An act in amendment of chapter 131 of the General Laws, entitled 'Of diminishing danger to life in case of fire.' " We thus discover that it is an act passed in the exercise of the police power, one of the highest prerogatives of the legislative body, arising out of the law of self preservation, for the purpose of promoting the safety and comfort of the people of the State. It also appears from the title and body of

the statute that it was not the first or original act relating
to the subject, for it is an amendment of Gen. Laws, cap.
131, § 2, which was passed April 22, 1908, as Pub. Laws,
cap. 1536, and was then entitled: "An act to diminish
danger to life in case of fire." It thus appears that in less
than a month over three years the general assembly saw fit
to modify a safety law that they had enacted, and it becomes
pertinent to inquire whether it was because they found it
in practice to be too severe or not stringent enough. Sec. 2,
reads as follows: "All theatres, halls, churches, and school
houses shall have the doors or windows of or to any exit or
fire escape, and of any opening thereto, so arranged as to
swing outward; and at no time when any show, performance,
exhibition, dance, ball, fair, service, or session is being given
or held therein, or any audience shall be present therein,
shall said doors or windows be locked." In the meantime
between the passage of said act and its amendment as afore-
said, Pub. Laws, cap. 472, entitled "An act in amendment
and revision of chapter 688 of the Public Laws, entitled
'An act in relation to buildings in the City of Providence and
for other purposes,' passed at the January Session, A. D.
1878, and the acts in amendment thereof and in addition
thereto," was passed April 30, 1909. This act related solely
to the City of Providence, and section 27 thereof provided
that "Every building hereafter erected or altered, to be
used as a theatre shall be subject to the following provisions
of this section." The provisions of Pub. Laws, 1911, cap.
702, relate to the whole State and thus supersede those of
the act last referred to. It now appears that until the pas-
sage of the act of May 12, 1911, there were no restrictions
upon theatres outside the City of Providence save those
relating to doors and windows, and that shortly after two
years from the passage of the act relating to theatres in the
City of Providence, the General Assembly passed a general
law comprising the whole State, the provisions of which are
more rigorous than those contained in the special act relating
to Providence. The plain purport of the act is an attempt

to save human life by diminishing the danger to the same incident to fire. It is an attempt to take advantage of the dreadful experiences of others and by requiring certain reasonable precautionary measures to be taken, by those who expect to obtain pecuniary profit from the congregation in large numbers of human beings in the places provided by them for the entertainment of the people, to avoid the needless sacrifice of priceless lives. It affects all theatres thereafter erected and that means all theatres not theretofore erected. And it includes all theatres in process of erection irrespective of the beginning of the work thereon whether before or after the passage of the act. It ought not to be construed strictly in favor of pecuniary economy and against human life or limb. It ought to be so construed as to effectuate the apparent intention of the General Assembly exerted in the interest of civilized humanity to diminish a danger incident to social life. Construed in this light the theatre in question is included within the purview of the act, and the "vested rights" of the defendants constitute no impediment to its enforcement. As was said by Gray, C. J., in *Salem* v. *Maynes*, 123 Mass. 372, 374: "There can be no doubt of the right of the legislature in the exercise of the police power and for the protection of persons and property against the dangers of fire, to authorize cities and towns, by ordinances and by-laws, to restrict or prohibit the erection of wooden buildings within the municipalities, or within any district thereof. *Respublica* v. *Duquet*, 2 Yeates, 493. *Wadleigh* v. *Gilman*, 3 Fairf. 403. All contracts between individuals, and even charters granted by the State, are subject to the exercise of this power. *Commonwealth* v. *Intoxicating Liquors*, 115 Mass. 153. *Woodlawn Cemetery* v. *Everett*, 118 Mass. 354. *Munn* v. *Illinois*, 94 U. S. 113.

"The St. of 1872, c. 243, has conferred on the cities and towns in this Commonwealth authority to pass such ordinances and by-laws, and on this court jurisdiction in equity to restrain the construction of buildings in violation thereof. The case stated shows that the City of Salem duly passed an

ordinance providing that no person should erect or cause to be erected a wooden building exceeding certain dimensions within a fire district, the boundaries of which were fixed by. the same ordinance; and that the defendants began to erect such a building within those limits after the ordinance took effect. The fact that, before the passage of the ordinance, the defendants had begun work on the cellar upon the site of the proposed building, and had made a contract between themselves for the erection of the building, and had bought and prepared lumber to carry out that contract, does not exempt them from the operation of the ordinance." See also *Knoxville* v. *Bird,* 80 Tenn. 121.

In fact the defendants concede the truth of the proposition that "a permit to build does not bar the General Assembly from enacting suitable police regulations," saying that is "a position with which the defendants are in entire accord. They at once admit the power of the legislature to so legislate as to interfere with vested rights, the only question being, has it chosen to so exercise this power?"

(4)   For the reasons already given this question must be answered in the affirmative.

The defendants claim that even if the amending act does require them to modify said plans and specifications, the question still remains what is the extent of such modifications, and more particularly, what is "an open court or space" within the meaning of said act; that the language of said injunction is vague and indefinite in that it does not indicate what kind of open ways or courts they must construct in order to comply with the act. They contend, "that the construction of covered courts or spaces open at either end for passing and not open to the sky, is the extent of the requirement imposed by said act. That this is a sound construction is supported by the following reasons:

"A.   The legislature has expressly indicated its intent to this effect.

"It is important to note that in Public Laws, cap. 472, sec. 27, the provision regarding a court adjoining a theatre

is as follows: 'Every theatre . . . shall have an open court or passageway . . . These passages shall be open to the sky opposite the whole depth of the auditorium." Here there is a provision in favor of an open court, followed by express words providing that it "shall be open to the sky." Compare with this the briefer language of the said amending act providing that 'Every such building shall have an open court or space' with absolutely nothing said as to an opening to the sky. The conclusion must be that the legislature, having in mind the broader provisions of the statute it was modifying, chose to limit the extent of the new courts or spaces upwards by leaving out any reference to the sky altogether.

"B. Sound reason for such a rule indicates legislative intent to this effect.

"The earlier law provided only for a court a part of the way on one side of a theatre only, and it was not considered a great hardship for property owners in the interests of public safety to keep said way open to the sky. But when the amending law provided for courts throughout the entire length of two sides the public was better protected while at the same time the burden on the property owner was increased. To offset this new burden, it was wisely decided, in view of the fact that the public would be as well protected, to omit the words 'open to the sky,' thus allowing for covered courts.

"C. Such a rule results from a strict construction of the term 'open court or space' in favor of the land owner and against the State.

"The authorities hold that this act, being penal in character, must be thus strictly construed in favor of the land owner and against the State."

We have already intimated that a life saving statute ought not to be so strictly construed in the interest of economy as to defeat its humane object and purpose; but, on the contrary, should be so construed as to give effect to the expressed and evident intention of the legislature. In

Pub. Laws, cap. 472, § 27, appears the first reference to "open court or passageway." The legislature evidently realized that the words needed some definition for later in the same section they added the following explanatory clause "These passages shall be open to the sky opposite the whole depth of the auditorium." The words "open court" therefore under that statute meant a court completely open overhead, one completely uncovered; not partly open and not completely closed. And there was good reason for such a requirement for when one is in such a court he is outside of the theatre and therefore in a position of greater safety, for nothing can fall upon him from the inside of the building. Having once defined the expression "open court" it was no longer undefined and it was not necessary to repeat the definition, or to say again the expression "open" means "open." That would remain as a definition until the legislature should see fit to define it anew.

In these circumstances we are of the opinion that the defendants are required by the provisions of Pub. Laws, 1911, cap. 702, § 2, to build open courts, *i. e.*, passages open to the sky, as therein specified. The defendant's appeal is, therefore, denied and dismissed; the decree appealed from is affirmed and the cause is remanded to the Superior Court for further proceedings.

*Albert A. Baker*, for complainant.

*Irving Champlin, Barney & Lee*, for various interveners.

*William A. Spicer, Jr., Edward P. Jastram, Edwards & Angell*, for respondents.